**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT,<br><br>    Plaintiff,<br><br>v.<br><br>CISCO SYSTEMS, INC.,<br><br>    Defendant. | Case No. 6:21-CV-00128-ADA<br><br>JURY TRIAL DEMANDED |

**DEFENDANT CISCO SYSTEMS, INC.'S REPLY CLAIM CONSTRUCTION BRIEF**
**REGARDING U.S. PATENT NOS. 7,443,859; 8,191,106; 8,989,216; AND 9,357,014**

# TABLE OF CONTENTS

Page

I.  U.S. Patent No. 7,443,859...............................................................................................1

    A.  "APN (Access Point Name) field" / "APN field" (Claims 1-5, 7, 9-11, 15-17, 22-24, 26) ......................................................................................................1

    B.  "explicitly indicates requesting either a private network address or a public network address" (Claims 1, 8-11, 15, 21-24, 26) ....................................................3

    C.  "a private network address" (Claims 1-5, 7-11, 15-17, 21-24, 26) .........................4

II.  U.S. Patent No. 8,191,106...............................................................................................6

    A.  "inter-technology change-off monitoring entity (ICME)" / "ICME" (Claims 1, 5-7, 10) ..........................................................................................................6

    B.  "converged network" (Claims 1, 10) ....................................................................7

III.  U.S. Patent No. 8,989,216...............................................................................................8

    A.  "context" (Claims 1, 2, 4, 5, 7, 9, 11-14) .............................................................8

    B.  "said specific context" / "said context" (Claims 2, 5, 7, 9)..................................10

    C.  "said command or AVP is defined by a second default definition" (Claim 4).....................................................................................................................11

IV.  U.S. Patent No. 9,357,014.............................................................................................13

    A.  "connected services layer" (Claims 1, 3-9, 12, 13, 15, 18, 19) ..............................13

    B.  "service name of the connected services layer" (Claims 1, 18, 19) ........................15

i

## TABLE OF AUTHORITIES

Page(s)

### CASES

*Allergan, Inc. v. Apotex Inc.*,
  754 F.3d 952 (Fed. Cir. 2014)............................................................................9

*Alloc, Inc. v. Int'l Trade Comm'n*,
  342 F.3d 1361 (Fed. Cir. 2003)........................................................................14

*Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*,
  334 F.3d 1294 (Fed. Cir. 2003)........................................................................13

*Bushnell Hawthorne, LLC v. Cisco Sys., Inc.*,
  813 F. App'x 522 (Fed. Cir. 2020) ...................................................................10

*Cross Med. Prods. Inc. v. Medtronic Sofamor Danek*
  424 F.3d 1293 (Fed. Cir. 2005)........................................................................11

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*,
  435 F.3d 1366 (Fed. Cir. 2006)........................................................................11

*Fintiv, Inc. v. Apple Inc.*,
  No. 18-CV-00372, Dkt. 86, 6 (W.D. Tex. Nov. 27, 2019) ......................................13

*Grp. One, Ltd. v. Hallmark Cards, Inc.*,
  407 F.3d 1297 (Fed. Cir. 2005)........................................................................12

*Levitation Arts, Inc. v. Fascination Toys & Gifts, Inc.*
  2008 WL 11334126 (W.D. Tex. Apr. 15, 2008)..................................................12

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...................................................................5, 7, 8

*Plate LLC v. RCTenn, LLC*,
  2019 WL 11254773 (M.D. Tenn. July 3, 2019) .....................................................9

*Schering Corp. v. Amgen Inc.*,
  222 F.3d 1347 (Fed. Cir. 2000)........................................................................13

*Sensor Elec. Tech. Inc. v. Bolb Inc.*,
  2019 WL 46445338 (N.D. Cal. Sept. 24, 2019) ..................................................10

*Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*,
  442 F.3d 1322 (Fed. Cir. 2006)..........................................................................2

## TABLE OF ABBREVIATIONS

| Abbreviation | Meaning |
|---|---|
| '014 patent | U.S. Patent No. 9,357,014 |
| '106 patent | U.S. Patent No. 8,191,106 |
| '216 patent | U.S. Patent No. 8,989,216 |
| '859 patent | U.S. Patent No. 7,443,859 |
| 3GPP | 3rd Generation Partnership Project |
| APN | Access Point Name |
| AVP | Attribute Value Pair |
| Br. | Cisco's Opening Claim Construction Brief (Dkt. 36) |
| Cisco | Defendant Cisco Systems, Inc. |
| CSL | Connected Services Layer |
| CSS | Connected Services Stack |
| Dkt. | Docket Number |
| GGSN | Gateway GPRS Support Node |
| GPRS | General Packet Radio Services |
| ICME | Inter-technology Change-off Monitoring Entity |
| NAT | Network Address Translator |
| Resp. | WSOU's Responsive Claim Construction Brief (Dkt. 39) |
| POSA | Person of Ordinary Skill in the Art |
| SGSN | Serving GPRS Support Node |
| WSOU | Plaintiff WSOU Investments, LLC d/b/a Brazos Licensing and Development |

WSOU's response illustrates exactly why claim construction is needed for the disputed terms.  WSOU repeatedly insists that no construction is needed because the meaning of the disputed terms is so clear, and yet for many terms, it does not actually say what that meaning is or whether it disputes Cisco's recitation of the plain meaning.  This approach leaves the jury to guess as to the meaning of the terms.  That is exactly what the claim construction process is designed to avoid.  Indeed, for most terms, Cisco merely seeks to articulate the plain meaning of the terms, as dictated by the claim language and how the terms are used in the art and in the patent.  That WSOU is unwilling to even agree that the terms have the meanings Cisco proposes—putting aside whether the Court should construe them—telegraphs WSOU's desire to cause mischief down the road.

For the few terms where WSOU actually provides a position as to "plain and ordinary meaning," WSOU largely agrees with Cisco's proposal.  Yet, despite that agreement, WSOU still argues that this Court should not provide the requisite clarity for a jury.  For the two terms that Cisco argues are indefinite, WSOU simply tries to rewrite the claims, which the Federal Circuit has repeatedly prohibited.

The Court should adopt Cisco's constructions, which are drawn directly from the intrinsic record, are consistent with the terms' plain meanings, and would provide clarity to the jury.

## I.     U.S. Patent No. 7,443,859

### A.     "APN (Access Point Name) field" / "APN field" (Claims 1-5, 7, 9-11, 15-17, 22-24, 26)

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Specific field identified as "Access Point Name" that contains the name of the access point | Plain and ordinary meaning |

WSOU ***does not dispute***[1] that the "APN field" refers to the well-known field that was specifically defined with that name in the GPRS standard.  Resp. 3.  This ends the inquiry; Cisco's

---

[1] All emphasis added unless otherwise noted.

construction should be adopted for the reasons set forth in its opening brief.  Br. 3–6.

The only argument WSOU raises in response completely misstates Cisco's position as a straw man.  WSOU argues that the APN field need not contain "***only*** the name of the access point." Resp. 3.  Cisco agrees with this and has never argued otherwise.  Cisco's construction simply states that the APN field "***contains*** the name of the access point."  There is no requirement that the APN field be ***limited to*** only the name of the access point.  In fact, the GPRS standard that Cisco cited in its opening brief contains additional information in the APN field, including the length of the access point name.  Br. 5–6 (citing Cisco Ex. 3, 384).

The reason that WSOU is so desperate to avoid construction is because, for infringement, WSOU alleges that ***a completely separate field*** from the APN field meets this limitation.  *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1327 (Fed. Cir. 2006) ("Although the construction of the claim is independent of the device charged with infringement, it is convenient for the court to concentrate on those aspects of the claim whose relation to the accused device is in dispute." (quotation omitted)).  WSOU's infringement case is based entirely on its ability to keep the term "APN field" undefined so that it can try to argue to the jury that the "APN Restriction" field—a different field that does ***not*** contain the name of the access point—satisfies the claims.  Once the term is construed to mean what everyone agrees it means, WSOU can no longer make such a spurious claim.  To allow WSOU to proceed with the term unconstrued would do nothing other than waste judicial and party resources.  Because there is no actual dispute that the APN field was a well-known, specifically defined field in the GPRS standard, Cisco respectfully requests that its construction be adopted.

B.   **"explicitly indicates requesting either a private network address or a public network address" (Claims 1, 8-11, 15, 21-24, 26)**

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Plain and ordinary meaning (particular bit or bits indicate requesting either a private or public network address, rather than determining the desired public or private assignment based upon the indicated access point) | Plain and ordinary meaning |

WSOU's argument is contrary to the well-understood distinction between the words "explicit" and "implicit." To be explicit, something must be actually stated—*e.g.*, "today is trash day." Implicit, on the other hand, requires a person to infer information—*e.g.*, inferring that today is trash day from the fact that "today is Sunday" if it was known that trash goes out on Sunday. Br. 7. WSOU apparently agrees with this fundamental distinction—which dooms its infringement case—but it objects to Cisco's proposed articulation of plain meaning. Each of WSOU's three arguments is unavailing and should be rejected.

First, WSOU argues that Cisco's construction improperly limits the construction to a single embodiment. Resp. 5–6. That is not correct. The claims require that the APN field "contain[s] ***information that explicitly indicates requesting either a private network address or a public network address*** to be assigned to the mobile station." '517 patent, cl. 1. For a request in the APN field to be ***explicit***, it is irrefutably true that there must be a bit or bits that explicitly make the request. The request cannot be inferred implicitly by other information. WSOU has not provided any example of an explicit request without a bit or bits being set; indeed, that is what explicit means. And the use of "such as" in the specification cannot change the meaning of "explicitly."

Second, WSOU argues that Cisco's construction is inconsistent with the claims, which recite that "one or more parameters" explicitly indicate the request for a public or private network. Resp. 6. WSOU's argument makes no sense because the one or more parameters ***must*** be made up of one or more bits; that is how parameters are sent. Br. 5–6; Cisco Ex. 3 (3GPP TS 24.008 v.

3

4.4.0), 384.  Cisco's clarification is therefore entirely consistent with the claims.

Third, WSOU attempts to distinguish the file history by arguing that an indication based on access point name will not necessarily be "implicit."  Resp. 6.  This is nonsense and contrary to the meaning of implicit.  A request for a public or private network address that is inferred from the access point name (rather than stated in the bits of the message itself) is, by definition, implicit. That is consistent with the well-understood meaning of "implicit" as distinct from "explicit."

Cisco's proposal gives the jury an understanding of what the difference is between implicit and explicit in exactly the same words as the applicants used in the specification and during prosecution.  Cisco thus respectfully requests that the Court adopt its construction.

**C.     "a private network address" (Claims 1-5, 7-11, 15-17, 21-24, 26)**

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| An address that is only visible within the network that assigned it | Plain and ordinary meaning |

Cisco's proposed construction of "private network address" is consistent with its plain meaning.  The term should be construed so that the jury is instructed as to what the term means. In its insistence that the term remain unconstrued, WSOU ignores the stated purpose of the patent: to assign a public network address when end-to-end security is needed.  '859 patent, 2:36-3:3, 3:51-55.  If the device has only a private network address, devices outside the network cannot communicate with the private network address device without going through a Network Address Translator.  *Id*., 2:44-3:5, Fig. 1.  Outside devices cannot communicate directly with a private network address because that address is not visible outside of the network—i.e., those private network addresses may be reused elsewhere in the network.  Br. 8–10.  There would be no need to assign a public address if devices outside the network could simply send a message to the private network address.  In other words, there would be no reason for the stated purpose of the invention.

To circumvent the purpose of the patent, WSOU makes four incorrect arguments:

First, WSOU's statement that a "private network address" is "an address for a private network" is inconsistent with the claims and the specification because it would encompass both "private network addresses" and "public network addresses." Resp. 7. According to the patent, a device in a private network (like device 204 in private network 201 in Fig. 2) could be assigned *either* a public network address *or* a private network address. '859 patent, 2:36-3:55. Both of those addresses would be "an address for a private network" since, regardless of whether a device is assigned a public or private address, it is still in the private network and it has a network address.

Second, WSOU's attempt to ignore the specification fails. Resp. 8. Terms must be construed in light of the totality of the intrinsic record. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313–17 (Fed. Cir. 2005). As detailed above, the entire purpose of the patent mandates Cisco's construction. And the specification explicitly states that "private addresses *must not be visible* outside the [network that assigned them]." '859 patent, 1:27-29. That the statement does not appear with the language "present invention" is of no import. The specification's express statement that private addresses "must not" be visible outside the network that assigns them cannot be ignored. *Phillips*, 415 F.3d at 1313.

Third, WSOU argues that the specification is ambiguous and should not be read into the claim language. Resp. 8. This argument fails for the same reason as its previous argument. The intrinsic record is clear that a private network address is only visible within the private network, which is why public network addresses may need to be assigned to preserve end-to-end security without the need for a Network Address Translator. *Id.*, 2:44-3:5, Fig. 1.

Fourth, WSOU argues, incorrectly, that Cisco's construction is inconsistent with the extrinsic evidence. Resp. 8. Nothing in Exhibit 2, including the quote identified by WSOU about a private *network*, not a private *network address*, changes the clear intrinsic record. *Phillips*, 415

5

F.3d at 1318 ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms.").

## II.     U.S. Patent No. 8,191,106

### A.     "inter-technology change-off monitoring entity (ICME)" / "ICME" (Claims 1, 5-7, 10)

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Entity that monitors the type of technology being used to access the converged network | Plain and ordinary meaning<br>Alternatively, "hardware and/or software which monitors one or more access types" |

WSOU's brief lays bare the inconsistency between its position and the language in the claims and the specification. Despite the unambiguous requirement of the claims of an *inter*-technology switch between two *different* technologies, WSOU insists—without a single citation to the patent to support its assertion—that the "first access technology" and "second access technology" need not be different access technologies. Resp. 10. This position is apparent in its alternative construction that requires monitoring only "*one or more* access types," as opposed to *more than one*. That argument is the epitome of patent rewriting. Every shred of intrinsic evidence demands the two technologies be different, from the use of the well-known prefix *inter-* (discussed above) to the fact that the stated purpose of the patent is to switch between different access technologies that may have different security policies. '106 patent, cl. 1; Br. 10–13.

WSOU makes two primary arguments to distract the Court from the language in the claim itself and the rest of the intrinsic record. First, WSOU argues that Cisco's proposed construction permits access by only a single technology. Resp. 9–10. That argument is plainly incorrect. Cisco's construction requires that the ICME monitor the "type of technology being used to access the converged network." The claims elsewhere require two or more different technologies because they recite switching from "a first access technology of the converged network to a second access technology of the converged network." '106 patent, cl. 1. As discussed, WSOU's argument that

6

these can be the same technology contradicts the language of the claims and the entire patent.[2]

Second, WSOU argues that Cisco's proposed construction unnecessarily limits the claims to monitoring *only* the type of technology being used to access the converged network.  Resp. 10.  Cisco's construction does no such thing.  It merely states *one* of the things that the ICME does is monitor the type of technology being used to access the converged network.  Consistent with its name, the ICME must monitor the technology currently being used to access the network to know when there is a change in access technology, as its name—and the rest of the claim—requires.

**B.    "converged network" (Claims 1, 10)**

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Network with a common core that supports multiple access technologies including both fixed and mobile access technologies | Plain and ordinary meaning |

WSOU's response illustrates its brazen attempt to replace the intrinsic record with irrelevant extrinsic sources; ***WSOU does not cite a single passage from the patent***.  Resp. 11–12.  Instead, WSOU relies upon seven random extrinsic sources that use the term "converged network" in a manner completely different than how it is used in the patent.  Such extrinsic sources are less reliable than the intrinsic record under binding precedent.  *Phillips*, 415 F.3d at 1318 ("We have viewed extrinsic evidence in general as less reliable than the patent and its prosecution history in determining how to read claim terms.").  Moreover, at least four of these sources are not from the relevant time frame when the patent was filed in 2007.  WSOU Exs. 13 (dated 2021), 14 (undated), 15 (undated), 18 (dated 2013); *Phillips*, 415 F.3d at 1313.

There is nothing in the specification—and WSOU cites nothing—that uses the term "converged network" to mean one that handles different media types, as WSOU's extrinsic

---

[2] WSOU complains that Cisco's proposed construction uses the term "entity" in the construction.  To avoid disputing an immaterial point, Cisco has no objection to using "hardware and/or software" instead of "entity."

evidence uses the term.  Indeed, the type of media has ***nothing*** to do with the alleged invention.  Instead, the patent is all about detecting ***different access technologies*** within a single network that can be accessed with such different technologies.  Br. 13–15.  It is in that context that the patent states—definitionally—that "***what is referred to as a converged network [] has a common core connecting to different access technologies***."  '106 patent, 2:7-12.

WSOU has no substantive response to this passage in the specification.  Instead, WSOU insists that nothing "in the specification or claims [] discloses that the converged network requires a plurality of types of access technologies."  Resp. 12.  Not true.  The claims themselves require "first" and "second" access technologies—i.e., a plurality.  '106 patent, cl. 1.  WSOU also contends that the patentee did not act as his own lexicographer.  That is not the test, and even if it were, the above-emphasized passage is clearly definitional.  Claims should be construed consistent with the totality of the intrinsic record, which supports Cisco's construction.  Br. 13–15; *Phillips*, 415 F.3d at 1313–17.  Since the patent unambiguously states what it means by a "converged network," that meaning controls, even if it is different from how the term is used in certain extrinsic sources.

## III.    U.S. Patent No. 8,989,216

### A.    "context" (Claims 1, 2, 4, 5, 7, 9, 11-14)

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| a specific condition to be met for the corresponding context-specific definition to apply | Plain and ordinary meaning |

WSOU does not have any substantive disagreement with Cisco's construction.  To the contrary, WSOU's explanation of the "plain and ordinary meaning" appears entirely consistent with Cisco's proposed construction:  "the situation in which a default definition or standard does not apply."  Resp. 14.  WSOU's articulation of the supposed plain and ordinary meaning would also be acceptable to Cisco.  WSOU also cites the dictionary definition as "the situation within which something exists or happens, and that can help explain it."  Resp. 15.  This definition would

also be acceptable to Cisco.  So long as "context" is clarified during claim construction, there can be no reasonable dispute that Cisco does not infringe.  Leaving this term vague would allow WSOU to cause mischief at trial, presenting an infringement case divorced from the claims.

Instead of raising substantive disagreements with Cisco's construction, WSOU quibbles with the wording of Cisco's construction and argues that Cisco's proposal is "unworkable" when inserted into the claim.  Resp. 13–14.  However, grammatical issues from a direct substitution of the proposal into the claim do not bar the Court's adoption if the definition otherwise makes sense. *Plate LLC v. RCTenn, LLC*, 2019 WL 11254773, at *16 (M.D. Tenn.  July 3, 2019) ("Plaintiff's proposal is only nonsensical when it is used to literally swap out the specific term.").  In fact, WSOU's own dictionary definition for context is also nonsensical if put directly into the claims.

WSOU claims that the language of the specification does not define "context," but "merely describes one role a context performs."  Resp. 13.  There is no need for a claim to have an explicit definition or disclaimer in the specification.  Rather, the Court's construction must take into account the entire specification.  *Allergan, Inc. v. Apotex Inc.*, 754 F.3d 952, 958 (Fed. Cir. 2014) (adopting construction that is consistent with "the patentee's own lexicography in light of the whole specification").  Here, the specification is clear that the context identifies when the context-specific definition applies.  Even if a definition were required, the patent does explicitly define the meaning of context *by defining its function*.  '216 Patent 3:11-14 ("A context identifies a specific condition to be met for the corresponding context-specific definition to apply.").

Cisco's definition is further supported by the portions of the specification that WSOU cites and by the prosecution history.  Br. 18.  A new 3GPP standard release as a "context" is exactly a condition that would be met that would require a context-specific definition to apply, as opposed to the default definition.  *Id.*, 3:42-45.  Similarly, a custom or proprietary implementation of a

9

standard as a "context" is another condition that would call for a context-specific definition.[3]

    **B.**    **"said specific context" / "said context" (Claims 2, 5, 7, 9)**

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Indefinite | Plain and ordinary meaning |

WSOU's own brief conclusively illustrates the indefiniteness of this term. WSOU argues that a POSITA would know that "said specific context" and "said context" would refer to "the 'first context' *or* 'second context.'" Resp. 16. Cisco could not have said it better; the disputed term refers to either the first or the second context, but there is no way to tell which one. That is precisely why the term is indefinite.

WSOU's attempt to distinguish *Bushnell Hawthorne, LLC v. Cisco Systems, Inc.*, in which the Federal Circuit invalidated strikingly similar language, is unavailing. 813 F. App'x 522 (Fed. Cir. 2020). WSOU's argument that *Bushnell* referred to three possible antecedent bases while the '216 Patent only has two is irrelevant. Resp. 21. The key issue is the same; a person skilled in the art would be unable to ascertain *which* of the contexts is the "said context" or "said specific context." *Bushnell*, 813 F. App'x at 526 ("With three different IP addresses to choose from, a POSA . . . is left to wonder which of the different IP addresses is 'said' different one."). WSOU's curious statement that "there is no singular/plural mismatch of terms" is also wrong; the disputed term is *singular* ("said [specific] context"), whereas there are *multiple* possible antecedent bases. *Sensor Elec. Tech. Inc. v. Bolb Inc.*, 2019 WL 4645338, at *31 (N.D. Cal. Sept. 24, 2019) (finding claim indefinite when "it is ambiguous whether the claim term 'the material' refers to 'a first layer composed of a material,' or 'a second layer composed of a material,' or both"); Br. 19–20.

---

[3] WSOU also alleges that extrinsic evidence supports WSOU's definition without any explanation of why that is the case. Resp. 15. WSOU's dictionary definitions of context are substantively identical in meaning to Cisco's proposal.

WSOU's cases are also inapposite.  In those cases, antecedent basis by implication was appropriate because there was only *one* obvious possibility, such that there was no ambiguity. *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.* 424 F.3d 1293, 1307 (Fed. Cir. 2005) ("said longitudinal axis" clearly referred earlier to one possible longitudinal axis in the claim); *Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1372 (Fed. Cir. 2006) ("said zinc anode" had one possible zinc anode in the claim).  Here, there are ***admittedly two*** possible "contexts" to which "said [specific] context" refers, rendering it indefinite.

The patent's prosecution history does not resolve the issue.  Even if "said specific context" had antecedent basis in some prior version of the claims where the "first context" and "second context" were both the "specific context," the claims as issued now have ***two*** options as to which is the specific context.  It cannot be both.

### C.      "said command or AVP is defined by a second default definition" (Claim 4)

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| Indefinite | Plain and ordinary meaning |

This term is indefinite because it is unclear whether the second definition applies to the previously defined command or the previously defined AVP.  Contrary to WSOU's argument, the face of the patent does not make it clear that the "second default definition" is necessarily an AVP. Claim 4 recites both a "command" and an "AVP."  There is no indication whatsoever in the claim which of those two items is being referred to by "said command or AVP."

WSOU's statement that a person of skill in the art "would understand" that term refers to the "immediately preceding noun" is contradicted by its claim language.  Resp. 23.  Patent claims routinely refer back to elements recited earlier in the claim.  Indeed, in claim 4 itself, the term "said Diameter protocol command dictionary" appears in the very same paragraph as the disputed term, as shown below:

a second definition for a Diameter protocol attribute value pair (AVP), wherein said command or AVP is defined by a second default definition unless a second context applies in which case said AVP is defined by ***a second context-specific definition, wherein said Diameter protocol command dictionary*** interoperates with a Diameter protocol stack to perform functions for processing Diameter messages.

'216 patent, cl. 4.  There, the immediately preceding noun to the "said Diameter protocol command dictionary" is "a second context-specific definition."  But the term clearly refers back to the "Diameter protocol command dictionary" from the preamble and the first paragraph, not the immediately preceding noun.  Thus, WSOU's assumption that the "said command or AVP" phrase must refer to the immediately-preceding noun does not find support even in claim 4 itself.

WSOU additionally tries—and fails—to find clarity by comparing claim 4 to claim 1. Resp. 23.  Even if claim 4 was meant to track claim 1, claim 1 is just as unclear.[4]  Claim 1 recites, "wherein said Diameter protocol or AVP is defined by a second default definition."  '216 Patent 5:16-21.  This clause states that the second default definition could be either an AVP or a Diameter protocol.  It makes no sense for a Diameter protocol to be defined by a second default definition, as the Diameter protocol is the entire framework for Diameter and contains both commands and AVPs.  *See* Cisco Ex. 10 (RFC 3588).  In contrast, the disputed phrase in claim 4 refers to two things that each are described in the specification to have default definitions—a command and an AVP—and there is no way to tell which one the second default definition applies in claim 4.

WSOU argues that the claim is correctable because the prosecution history supports that there was an error.  Resp. 23–25.  However, altering a drafting error is not proper if the error is not clear on the face of the patent and is only obvious from the prosecution history.  *Grp. One, Ltd. v. Hallmark Cards, Inc.*, 407 F.3d 1297, 1302–03 (Fed. Cir. 2005); *see also Levitation Arts, Inc. v.*

---

[4] But for term limits, Cisco would have briefed the indefiniteness of claim 1 on similar grounds.

*Fascination Toys & Gifts, Inc.* 2008 WL 11334126, at *2 (W.D. Tex. Apr. 15, 2008) ("[A] good-faith effort to avoid infringing the patent does not require competitors to delve more deeply into the patent's history than the patent holder").  Here, WSOU's references to the prosecution history to clarify the claim do not permit judicial correction because the face of the patent remains unclear. WSOU should instead file for a reissue patent correcting this claim.

**IV.    U.S. Patent No. 9,357,014**

**A.    "connected services layer" (Claims 1, 3-9, 12, 13, 15, 18, 19)**

| Cisco's Proposal | WSOU's Proposal |
|---|---|
| a layer that supports a service connection between two endpoints | Plain and ordinary meaning<br>Alternatively, "a layer that supports establishment of a service connection" |

WSOU relies on two arguments for why "connected services layer" is not a coined term—both should be rejected and the Court should find that "connected services layer" is a coined term. WSOU relies on extrinsic evidence from ***seven years after*** the '014 patent's priority date.  Resp. 26 (citing WSOU Ex. 23 (copyright 2021)).  But terms should be construed based on "what the term meant ***at the time*** the patentee filed the . . . application."  *Schering Corp. v. Amgen Inc.*, 222 F.3d 1347, 1353 (Fed. Cir. 2000).  The Court should reject WSOU's attempt to retroactively attribute a meaning to this term.  *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1299 (Fed. Cir. 2003) (rejecting evidence from seven years after filing date and five years after issue date because it was "***not contemporaneous***" and "d[id] not reflect the meanings that would have been attributed to the words in dispute by [POSITA] ***as of*** the grant of the [patent]").

Second, WSOU argues that a skilled artisan would understand the term "connected services layer" from the specification.  As this Court explained, a coined term can only have a plain and ordinary meaning "when the ***components*** of the term have well-recognized meanings."  *Fintiv, Inc. v. Apple Inc.*, No. 18-CV-00372, Dkt. 86, 6 (W.D. Tex. Nov. 27, 2019).  If the meaning of the

term cannot be inferred from term's individual parts, then it must be construed by relying on the specification.  *Id.*, 5–8 (construing coined term because wallet management applet "is not only an 'applet' as a POSITA would infer from its component words").  WSOU ignores the component words of "connected services layer" and jumps directly to the specification.  This is improper.  Because the meaning of "connected services layer" cannot be inferred from its components, the term must be construed.  Br. 25–26 (explaining how patent describes this term).

Recognizing the futility of its position, WSOU, for the first time, proposes a competing construction to Cisco's proposal.  WSOU's sole criticism of Cisco's construction is that it purportedly "ignor[es]" embodiments.  But, WSOU cannot point to a single embodiment where the connected services layer does not support a service connection between two endpoints.  *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1369–70 (Fed. Cir. 2003) (limiting claims to disclosed feature where "all the figures and embodiments disclosed in the asserted patents imply" or "expressly disclose" the feature).  The sole purpose of the patent is to provide a better networking *connection*, which necessarily must be between two endpoints.  '014 patent, 1:22-24 ("[T]here is a need for improvements in support for *networking connections*.").

Meanwhile, WSOU's alternative proposal omits necessary characteristics of a connected services layer.  The connected services layer must be *between* two endpoints.  There is not a single disclosure in the patent of a connected services layer that is not between two endpoints.  WSOU even lifts its alternative proposed construction from a sentence in the specification that expressly discusses a connection *between two endpoints*.  Resp. 27 (citing '014 Patent, 1:44-46 ("the connected services layer configured to support establishment of a service connection *between* the connected services layer and a remote connected services layer of a remote endpoint")).  Yet, inexplicably, WSOU provides no reason for its omission of *between* two endpoints.  WSOU's

construction also ignores that the connected services layer does more than just establish a connection—it *supports* the connection between two endpoints.  Br. 25–26 (describing encryption, retransmission, IP address changes).  It is readily apparent that WSOU seeks to avoid the specification's description of a connected services layer, because the 5G standard, which WSOU asserts infringes this patent, does not have a connected services layer between two endpoints.  The Court should reject WSOU's attempt to define "connected services layer" in a manner that is inconsistent with the patent, and adopt Cisco's proposed construction.

### B.    "service name of the connected services layer" (Claims 1, 18, 19)

| Cisco's Proposal | WSOU's Proposal |
| --- | --- |
| service name of the requesting connected services layer | Plain and ordinary meaning |

WSOU spends its response insisting that this term is so clear that it need not be defined.  Yet it never takes a position on the critical question in dispute:  does this term refer to the service name of the *requesting* connected services layer or of *any* connected services layer?  That is the *only* question raised by this term, and WSOU refuses to answer it.[5]  Of course, the reason is clear: WSOU does not want to take a position because it would be unable to pursue an infringement case.  Instead WSOU focuses on an *undisputed* portion of the term, "service name."  Thus, WSOU's citations to evidence and the specification discussing "service name," Resp. 28–29 (citing WSOU Exs. 24-27), are inapposite to the actual dispute.

This dispute is solely about which connected services layer is referred to by this term, and it should be resolved at claim construction.  While the term itself is not clear, the intrinsic record could not be clearer—it is the *requesting* connected services layer, as explained in Cisco's opening brief.  Br. 28.  The Court should resolve the ambiguity and adopt Cisco's construction.

---

[5] Contrary to WSOU's claim, Cisco raised this dispute during the meet and confer process.  Cisco Ex. 14 (WSOU refusing to agree that the term refers to the *requesting* connected services layer).

Date:   November 10, 2021

Respectfully Submitted,

_/s/Brian Rosenthal with permission,_
_by Michael E. Jones_

Michael E. Jones
SBN: 10929400
**POTTER MINTON**
110 North College, Suite 500
Tyler, TX 75702
mikejones@potterminton.com
Telephone: (903) 597-8311
Facsimile: (903) 593-0846

Brian Rosenthal
Katherine Dominguez
Allen Kathir
Admitted *pro hac vice*
brosenthal@gibsondunn.com
kdominguez@gibsondunn.com
akathir@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
200 Park Avenue
New York, NY 10166
Tel:  (212) 351-4000

Ryan Iwahashi
Admitted *pro hac vice*
riwahashi@gibsondunn.com
**GIBSON, DUNN & CRUTCHER LLP**
1881 Page Mill Road
Palo Alto, CA 94304
Tel: (650) 849-5367

Kenneth G. Parker
kparker@gibsondunn.com
**GIBSON, DUNN AND CRUTCHER LLP**
3161 Michelson Drive
Irvine, CA 92612
Tel: (949) 451-4336

*Attorneys for Defendant Cisco Systems, Inc.*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that on November 10, 2021, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document through the Court's CM/ECF system under Local Rule CV-5(b)(1).

*/s/ Michael E. Jones*