**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| WSOU INVESTMENTS, LLC D/B/A BRAZOS LICENSING AND DEVELOPMENT, | |
| Plaintiff, | CIVIL ACTION NO. 6:21-cv-00128-ADA |
| v. | JURY TRIAL DEMANDED |
| CISCO SYSTEMS, INC. | ███████████████████████ |
| Defendant. | |

**BRAZOS'S OPPOSITION TO DEFENDANT'S**
**MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION**
<u>**UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(1) (DKT. 75)**</u>

# TABLE OF CONTENTS

I.      INTRODUCTION ..............................................................................................1

II.     FACTUAL BACKGROUND...........................................................................1

        A.      The Parties and the Patent Purchase Agreement............................................1

        B.      Wade assigned the ███████████ in the PPA to Brazos,
                which paid ███████████ for the Terrier Patents. ...........................................2

        C.      ████████████████████████████████████████
                ████████████████████████████████████████
                ████████████████████████████████████████...................3

III.    ARGUMENT..................................................................................................4

        A.      Whether Brazos owns the rights to the '106 patent does not
                implicate the Court's subject matter jurisdiction. ........................................4

        B.      Brazos owns the '106 patent. ...................................................................11

        C.      ████████████████████████████████████████
                ████████████ ...........................................................19

IV.     CONCLUSION...............................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abraxis Bioscience, Inc. v. Navinta LLC,*
625 F.3d 1359 (Fed. Cir. 2010)..................................................................................10

*BSC Assocs., LLC v. Leidos, Inc.,*
91 F. Supp. 3d 319 (N.D.N.Y. 2015)..........................................................................17

*C.R. Daniels, Inc. v. Naztec Int'l Grp., LLC,*
2012 WL 1268623 (D. Md. Apr. 13, 2012).............................................................14, 15

*DDB Techs., LLC v. MLB Advanced Media, LP,*
517 F.3d 1284 (Fed. Cir. 2008).............................................................................12, 13, 14

*Domain Protection, LLC v. Sea Wasp, LLC,*
23 F.4th 529 (5th Cir. 2022) ....................................................................................8, 9

*Filmtec Corp. v. Allied-Signal Inc.,*
939 F.2d 1568 (Fed. Cir. 1991)..................................................................................13

*Harris v. Uhlendorf,*
24 N.Y.2d 463 (1969) .................................................................................................18

*K-Con Bldg. Sys., Inc. v. United States,*
778 F.3d 1000 (Fed. Cir. 2015)..................................................................................11

*Lexmark International, Inc. v. Static Control Components, Inc.,*
572 U.S. 118 (2014)...................................................................................................6, 7

*Lone Star Silicon Innovations LLC v. Nanya Technology Corp.,*
925 F.3d 1225 (Fed. Cir. 2019)..................................................................................6, 7

*Morrow v. Microsoft Corp.,*
499 F.3d 1332 (Fed. Cir. 2007).............................................................................5, 6, 10

*Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.,*
215 F.3d 1281 (Fed. Cir. 2000)..................................................................................11

*Paterson v. Weinberger,*
644 F.2d 521 (5th Cir. 1981) .....................................................................................11

*Roc Nation LLC v. HCC Int'l Ins. Co., PLC,*
523 F. Supp. 3d 539 (S.D.N.Y. 2021)........................................................................18

ii

*Schwendimann v. Arkwright Advanced Coating, Inc.*,
   959 F.3d 1065 (Fed. Cir. 2020)................................................................. *passim*

*Sims v. Mack Trucks, Inc.*,
   407 F. Supp. 742 (E.D. Pa. 1976) ...................................................................15

*Slingshot Printing LLC v. HP Inc.*,
   No. 1:20-cv-00184-ADA, 2020 WL 6120177 (W.D. Tex. July 7, 2020).............................10

*SM Kids, LLC v. Google LLC*,
   963 F.3d 206 (2d Cir. 2020)...........................................................................9

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000)......................................................................12

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)................................................................................5

*Univ. of S. Fla. Research Foundation, Inc. v. Fujifilm Medical Sys.*,
   19 F.4th 1315 (Fed. Cir. 2021) .......................................................................8

*Wheelabrator Techs. of N. Am., Inc. v. Fin. Sec. Assurance of Okla., Inc.*,
   1990 WL 180552 (S.D.N.Y. Nov. 15, 1990) ........................................................17

*WiAV Sols. LLC v. Motorola, Inc.*,
   631 F.3d 1257 (Fed. Cir. 2010)........................................................................6

## STATUTES

35 U.S.C. § 281.........................................................................................6, 7

**TABLE OF EXHIBITS**

| Exhibit | Document Description |
|---------|---------------------|
| Ex. A | ██████████ Patent Purchase Agreement |
| Ex. B | ██████████ First Amendment to Patent Purchase Agreement |
| Ex. C | ██████████ Wade Assignment of PPA to Brazos |
| Ex. D | ██████████ Second Amendment to Patent Purchase Agreement |
| Ex. E | ██████████ Third Amendment to Patent Purchase Agreement |
| Ex. F | ██████████ Fourth Amendment to Patent Purchase Agreement |
| Ex. G | ██████████ Fifth Amendment to Patent Purchase Agreement |
| Ex. H | ████████████████████ |
| Ex. I | ██████████ Patent Purchase and License Agreement |
| Ex. J | ██████████ Patent License and License Option Agreement |
| Ex. K | ██████████ License Agreement |
| Ex. L | ██████████ License Agreement |
| Ex. M | ██████████ License Agreement |
| Ex. N | ██████████ Declaration of Craig Etchegoyen |
| Ex. O | ██████████ Declaration of Craig Etchegoyen |
| Ex. P | ██████████ Declaration of Marc Wade |

## I.      INTRODUCTION

Cisco's Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction is as legally erroneous as it is factually implausible. Legally speaking, Cisco's motion is procedurally improper. Its arguments that Brazos does not own U.S. Patent No. 8,191,106 (the " '106 patent") and that Brazos cannot seek pre-assignment damages for U.S. Patent Nos. 8,989,216 (the " '216 patent"), 7,443,859 (the " '859 patent"), and 9,357,014 (the " '014 patent") implicate only the merits of Brazos's infringement claims—not this Court's jurisdiction. Cisco's merits-masquerading-as-jurisdiction motion should be denied on this basis alone. Factually speaking, Cisco advances the absurd conclusion that Wade, an entity that does not purport to own the '106 patent, that disclaims owning the patent, and that has never paid a penny for the portfolio of patents to which the '106 patent belonged, nonetheless still owns the '106 patent.

In short, Brazos owns the '106 patent. And by the plain text of the agreement assigning Brazos rights to the '216, '859, and '014 patents, Brazos possesses the right to seek "remedies of any kind for past . . . infringement." Cisco's procedurally defective motion should be denied.

## II.     FACTUAL BACKGROUND

### A.      The Parties and the Patent Purchase Agreement

On ▮▮▮▮▮▮▮▮, the Nokia Entities[1] ("Nokia") and Wade & Company executed a Patent Purchase Agreement ("PPA") stating that Wade ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

---

[1] The Nokia Entities refers to Alcatel Lucent, Nokia Solutions and Networks BV, and Nokia Technologies Oy.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

On ███████████, Nokia and Wade executed the First Amendment to the PPA. ███████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████

**B.**     **Wade assigned** ██████████████████████ **the PPA to** ████████████████
██████████████████████████.

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

When Wade assigned the PPA to Brazos, █████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

Nokia accepted ███████████████████████████████████████

**C.** █████████████████████████████████████████████

Recognizing that Wade had assigned its rights in the PPA to Brazos, and that Brazos was the owner of the assigned patents, Nokia and Brazos continued to work together in the years following Brazos's purchase ████████████████████████ after the First Amendment, Nokia, Wade, and Brazos entered a Second Amendment ███████████████████████████ Nokia and Brazos entered a Third Amendment ██████████████████████████████████████

███████ a Fourth Amendment followed, ███████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

Thereafter, Nokia and Brazos entered Fifth and Sixth Amendments to the PPA. Under the

Fifth Amendment, Nokia and Brazos agreed that ████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

On February 5, 2021, Brazos sued Cisco for infringing the '106, '216, '859, and '014

patents. Dkt. 1. On June 3, 2022, Cisco filed its Motion to Dismiss for Lack of Subject Matter

Jurisdiction Under Federal Rule of Civil Procedure 12(b)(1). Dkt. 75 ("Mot.").

## III.   ARGUMENT

### A.   Whether Brazos owns the rights to the '106 patent does not implicate the Court's subject matter jurisdiction.

#### 1.   The Patent Act's statutory requirements are not jurisdictional; Brazos has Article III standing because it has alleged an "arguable case or controversy under the Patent Act."

Cisco's lead argument is that Brazos "never obtained any rights in the '106 patent," and

therefore, Brazos suffers "no injury in fact from alleged infringement" and thus "lacks Article III

standing to assert the '106 patent." Mot. at 11–18. As explained in detail below, Brazos obtained

all rights to the '106 patent. But Cisco's argument suffers from an even more fundamental defect:

It does not implicate this Court's subject matter jurisdiction at all.

Article III of the Constitution "confines the federal judicial power to the resolution of

'Cases' and 'Controversies.'" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). A case

or controversy requires the plaintiff to "have a 'personal stake' in the case." *Id.* A plaintiff must show "(i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Id.*

According to Cisco, an invalid assignment of patent rights divests the Court of jurisdiction. That is because "[t]o meet the 'injury in fact' requirement for constitutional standing, the plaintiff must possess exclusionary rights in the patent." Mot. at 10. And "[a] plaintiff lacking exclusionary rights cannot have constitutional standing because no injury in fact can occur." *Id.* (citing *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340–41 (Fed. Cir. 2007)).

But the law that Cisco cites is no longer good law. Exclusionary rights are not a prerequisite for Article III standing. Rather, a patent plaintiff has Article III standing so long as he "alleges facts that support an arguable case or controversy under the Patent Act." *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 (Fed. Cir. 2020).

The evolution of the Federal Circuit's patent standing law is worth unpacking. At one time, the Federal Circuit indeed tied the existence of constitutional standing to the existence of an exclusionary right under the Patent Act. Relying on a 1975 Supreme Court opinion, the Federal Circuit reasoned that "[e]ssentially, the standing question . . . is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Morrow*, 499 F.3d at 1339 (quoting *Warth v. Seldin*, 422 U.S. 490, 500 (1975)). Because under the Patent Act, a "patentee" is entitled to bring a "civil action for infringement of his patent," and "[a] patent grant bestows the legal right to exclude others from making, using, selling, or offering to sell the patented invention in the United States," *id.* (citing 35 U.S.C. §§ 100, 154, 271), *Morrow* concluded that "[c]onstitutional injury in fact

occurs when a party performs at least one prohibited action with respect to the patented invention that violates these exclusionary rights." *Id.*; *see also WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) ("Because the Patent Act creates the legally protected interests in dispute, the right to assert infringement of those interests comes from the Act itself."). In other words, though the right to exclude was merely a statutory requirement for asserting infringement under the Patent Act, the Federal Circuit imbued that statutory requirement with constitutional significance.

This was error from the start. As the Supreme Court explained in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 128 n.4 (2014), "statutory standing" defects do not implicate Article III or subject-matter jurisdiction:

> We have on occasion referred to this inquiry as "statutory standing" and treated it as effectively jurisdictional. That label is an improvement over the language of "prudential standing," since it correctly places the focus on the statute. But it, too, is misleading, since "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e., the court's statutory or constitutional power to adjudicate the case.' "

In *Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*, 925 F.3d 1225 (Fed. Cir. 2019), the Federal Circuit took the first step toward correcting its error. There, the original assignee of the patents, AMD, executed an agreement transferring "all right, title and interest" in the patents to the plaintiff, Lone Star. *Id.* at 1227. But the agreement also imposed significant limits on Lone Star. *Id.* at 1227–28. The defendant, Nanya Technology, argued that Lone Star lacked "standing"—in the jurisdictional, Article III sense—because it did not possess "all substantial rights" in the patents, and thus was not a "patentee" entitled to sue for infringement under 35 U.S.C. § 281. *Id.* at 1234.

The Federal Circuit disagreed. It acknowledged that "we have often treated 'statutory standing,' *i.e.* whether a party can sue under a statute such as § 281, as jurisdictional." *Id.* at 1235.

6

In light of *Lexmark*, however, the Federal Circuit recognized that "so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction." *Id.* at 1235–36.

To be sure, *Lone Star* did not consider the constitutional dimensions of the "exclusionary rights" rule. There was no dispute there that the transfer agreement assigned Lone Star at least one exclusionary right to the patents. But why, one might wonder, is the argument that the plaintiff possesses "no exclusionary rights"—and therefore, is not a "patentee" under 35 U.S.C. § 281—*jurisdictional* in nature, while the argument that a plaintiff does not possess "all substantial rights"—and therefore, is not a "patentee" under 35 U.S.C. § 281—runs to the merits?

A year later, in *Schwendimann v. Arkwright Advanced Coating, Inc.*, 959 F.3d 1065, 1071 n.6 (Fed. Cir. 2020), the Federal Circuit clarified this conundrum: Exclusionary rights in a patent are *not* necessary for Article III standing because "the Supreme Court [has] made clear that virtually all statutory filing prerequisites are non-jurisdictional." In *Schwendimann*, due to an error in the assignment documents, the plaintiff Ms. Schwendimann had no rights in the patents when she sued for patent infringement. *Id.* at 1069–70. After the defendant Arkwright moved to dismiss for lack of jurisdiction, Schwendimann executed a new assignment that corrected the defect. *Id*. at 1070.

Though both parties briefed the issue as one of "standing," the court explained that "[i]n *Lone Star*, we made clear that whether one qualifies as a patentee under 35 U.S.C. § 281 is a statutory prerequisite to the right to relief in a patent infringement action, but does not implicate the district court's subject matter jurisdiction." *Id.* at 1071. For Article III purposes, the court explained, "[a]s long as a plaintiff alleges facts that support an ***arguable case or controversy under the Patent Act***, the court has both the statutory and constitutional authority to adjudicate the matter." *Id.* (emphasis added). And "[b]ecause Ms. Schwendimann's Complaint contained such

allegations—that she is the owner by assignment of the '845 patent and Appellants infringed that patent—there is no 'standing' issue to be decided in this appeal." *Id.*

*Schwendimann*'s rule accords with analogous Fifth Circuit law.[2] In *Domain Protection, LLC v. Sea Wasp, LLC*, 23 F.4th 529, 533–35 (5th Cir. 2022), an assignee of over 50,000 internet domain names, Domain Protection, sued the registrar of the domain names, Sea Wasp, for a host of common law tort claims, alleging that Sea Wasp had encroached on its proprietary interest in the domain names. Sea Wasp moved to dismiss for lack of "standing," arguing that because the assignment of the domain names to Domain Protection was invalid, "Domain Protection is not the rightful holder of them and thus cannot claim it was injured by something that happened to the domain names." *Id.* at 536.

The court rejected this argument out of hand, holding that whether the assignment of domain names to Domain Protection was valid did not "go to Article III standing." *Id.* Rather, it explained, "Sea Wasp [was] asserting that Domain Protection ha[d] no contractual right to the domain names," which is "not a question of Article III standing," but rather "an issue of contract interpretation that goes to the merits of a claim." *Id.* (citations omitted).

The Fifth Circuit went on to articulate the same rule that *Schwendimann* had articulated in the patent context:

> Looking beyond the contract context, a dispute about ownership of an asset—a frequent source of litigation—does not deprive a federal court of jurisdiction. *See Webb v. City of Dallas*, 314 F.3d 787, 791 (5th Cir. 2002) (recognizing that it was sufficient for Article III standing that the plaintiffs alleged they owned disputed land even if they "may ultimately fail to prove ownership"). Imagine a diversity suit seeking to recover allegedly stolen jewelry. Not possessing the jewelry is the

---

[2] The Federal Circuit has recently suggested that the issue of Article III standing may be governed by the law of the regional circuit—here, the Fifth. *See Univ. of S. Fla. Research Foundation, Inc. v. Fujifilm Medical Sys.*, 19 F.4th 1315, 1323–24 (Fed. Cir. 2021) ("We apply regional circuit law to our review of a dismissal of a complaint for lack of standing unless the issue is unique to patent law and therefore exclusively assigned to the Federal Circuit."). Whether Federal Circuit or Fifth Circuit law governs, the result is the same: A challenge to a party's ownership of an asset as an affirmative defense implicates only the merits, not jurisdiction.

> plaintiff's Article III injury. The defendant may defend the claim on the ground that
> the plaintiff never had a right to the jewelry. But that argument goes to the merits
> question of who owns the jewelry. . . . If the law were otherwise, the entire lawsuit
> over the disputed jewelry would be resolved as a question of jurisdiction.

*Id.* Thus, the court concluded, it was "enough for Article III's injury-in-fact requirement that

Domain Protection contended when filing suit that it did not possess domain names it owned." *Id.*[3]

Here, like in *Schwendimann* and *Domain Protection*, "there is no 'standing' issue to be

decided." 959 F.3d at 1071. Cisco's argument that Brazos does not own the '106 patent, and

therefore cannot sue for patent infringement under the Patent Act, runs to the merits.[4] Under

*Schwendimann* and *Domain Protection*, Brazos undoubtedly has Article III standing: Brazos has

alleged that it is the owner of the '106 patent, that Cisco has infringed the patent, and thus that it

has suffered economic injury caused by Cisco that is redressable by a remedy for damages. Dkt.

1, ¶¶ 39, 41, 54.

2.      The Court should deny Cisco's motion as procedurally improper.

Because Cisco's motion does not implicate the Court's subject-matter jurisdiction, its

12(b)(1) motion for lack of subject matter jurisdiction is procedurally improper and should be

denied on this basis alone. Given Cisco's reliance on evidence external to the pleadings and on

facts beyond which the Court may take judicial notice, the motion cannot simply be converted to

a Rule 12(b)(6) motion to dismiss. Nor does Rule 12(d) provide a vehicle for converting Cisco's

motion into one for summary judgment. That rule, by its express terms, authorizes the Court to

---

[3] The Second Circuit has reached the same conclusion. *See SM Kids, LLC v. Google LLC*, 963 F.3d 206, 211 (2d Cir. 2020) (holding that "the validity of the assignment" of a trademark was not a question of Article III standing, but instead one of "contractual standing" that "does not implicate subject-matter jurisdiction"). Where the plaintiff "plausibly allege[d]" a violation of the contract and that it had thereby been caused economic injury, Article III's injury-in-fact requirement was satisfied. *Id.*

[4] Cisco's request for relief—that the Court dismiss the case *with prejudice*—confirms that it seeks relief on the merits and not for lack of jurisdiction. Mot. at 20.

convert only a "motion under Rule 12(b)(6) or 12(c)" into a Rule 56 motion for summary judgment. Cisco's motion should be denied on this basis alone.

   3. <u>If there was any defect in the chain of assignment, the proper remedy is not to dismiss the case, but to permit Brazos to cure it.</u>

  One more implication follows from the fact that Cisco's motion does not run to jurisdiction: To the extent there was any defect in the chain of assignment (there was not), the proper remedy is to allow Brazos to cure it. As Cisco points out, the Federal Circuit has previously refused to allow a plaintiff to correct assignment defects after filing suit because it has treated these defects as jurisdictional. Mot. at 2 ("Each of these defects is jurisdictional and cannot retroactively be cured."). For instance, in *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010), the court reasoned that "in a patent infringement action, 'the plaintiff must demonstrate that it held enforceable title to the patent at the inception of the lawsuit to assert standing.' . . . Thus, 'if the original plaintiff lacked Article III initial standing, the suit must be dismissed, and the jurisdictional defect cannot be cured' after the inception of the lawsuit." As previously explained, this is no longer a correct statement of the law. These defects implicate only "statutory" or "prudential standing," which a plaintiff "may cure . . . after it files suit." *Slingshot Printing LLC v. HP Inc.*, No. 1:20-cv-00184-ADA, 2020 WL 6120177 (W.D. Tex. July 7, 2020); *see also Morrow*, 499 F.3d at 1341 (distinguishing prudential and constitutional standing because constitutional standing "cannot be cured"). Thus, should the Court find any defect, the proper remedy is to permit Brazos to cure it—not to dismiss the case.

**B.      Brazos owns the '106 patent.**

In addition to being procedurally improper, Cisco's motion is also substantively wrong:

Brazos owns the '106 patent.[5]

1.      The Terrier Patents were assigned to Brazos through the PPA, the First
         Amendment, and the PPA Assignment.

---

[5] As the following discussion will establish, a preponderance of the evidence shows that Brazos owns the '106 patent. *See K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015) ("A plaintiff bears the burden of establishing subject matter jurisdiction by a preponderance of the evidence." (quotation marks omitted)); *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (same).

But because patent ownership implicates the merits—rather than jurisdiction—Cisco's motion is properly understood as a motion for summary judgment. And summary judgment is appropriate only if there is no genuine issue of material fact. *Northern Telecom Ltd. v. Samsung Elecs. Co., Ltd.*, 215 F.3d 1281, 1286 (Fed. Cir. 2000) (citing Fed. R. Civ. P. 56(c)). The Court must draw all reasonable factual inferences in favor of the nonmovant—here, Brazos. *Id.*

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███

Cisco's argument that Wade, not Brazos, holds title to the Terrier Patents turns on the premise that the PPA, as amended, was not a present assignment of patent rights. Rather, Cisco says, separately executed schedules—████████████████████████████████— assigned patent rights from Nokia to Wade. Because the PPA itself assigned no patent rights, Cisco contends, the Assignment of the PPA from Wade to Brazos did not and could not assign the patent rights to Brazos. Mot. at 11–18.

But the premise that ████████████████████████████████, constitutes the relevant assignment of patent rights is wrong. ████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████Courts have routinely recognized that language like "hereby, sell, transfer and assign" effects a present assignment, not merely "an [o]bligation to [a]ssign," Mot. at 11. *See DDB Techs., LLC v. MLB Advanced Media, LP*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (contract that "agrees to and does hereby grant and assign" was an express assignment); *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (contract providing that "[employee] hereby conveys, transfer, and assigns to

[employer]" was an express assignment); *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991) (contract providing that the inventor "agrees to grant and does hereby grant" all rights in future inventions was an express assignment). Indeed, in suggesting that Amended Schedule B1 "includes the necessary present assignment language," Cisco relies on nearly identical language from the amended schedule: ██████████████████████ ███████████████

Cisco nonetheless asserts that relying on the express present-assignment language "[i]solat[es] words" out of context. Mot. at 13. It contends that ████████████████ ████████████████████████████████████████████████ ██████████████ But Cisco's argument does not follow. The existence of the ████████ ████████████████████████████████████. Instead, properly understood, ███████████ automatically assigns patent rights ██████████.

*DDB Technologies, LLC v. MLB Advanced Media, LP*, 517 F.3d 1284 (Fed. Cir. 2008), is instructive. There, the court considered an employee's assignment of patent rights to all future inventions to his employer: "Employee agrees to and does hereby grant and assign to Company or its nominee his entire right, title and interest in and to ideas, inventions and improvements . . . ." *Id.* at 1287. Of course, when the employee signed the agreement, those future inventions did not exist, so the assignment did not have present effect. But that did not render the assignment meaningless. Given the contractual language "agrees to *and does hereby grant and assign*," any patents which fell within the scope of the agreement "would have been automatically assigned" to the employer "by operation of law with no further act required on the part of the [employer]." *Id.* at 1290. Similarly here, until payment, no assignment was effective. But once payment was made, assignment occurred automatically, with "no further act required."

In any event, Cisco's argument proves too much. By its logic, ███████████ cannot be the relevant assignment document either, as it was executed on ██████ before ███████. As Cisco aptly explains, "the Nokia entities would not automatically transfer thousands of patents to a third-party before receiving initial payment." Mot. at 12. To the extent Cisco nonetheless means to suggest that the amended schedules—executed pursuant to the PPA itself, ███████████████—somehow overrode the PPA and transferred thousands of patents from Nokia to Wade for free, its argument is self-refuting. And it clearly runs contrary to the intent of the Parties.

Separately, Cisco insists that ███████████ must be the relevant assignment document because if the PPA had already transferred patent rights, the amended schedules would be meaningless. Mot. at 14. But this argument also runs headlong into *DDB Technologies*. In addition to the provision assigning rights to future inventions to the employer, the employment agreement there required the employee "to execute specific assignments and do anything else properly requested by [the employer], at any time during or after employment with [employer], to secure such rights." 517 F.3d at 1287. Yet the Federal Circuit held that the employment agreement *itself* constituted an automatic assignment of rights to future inventions. *Id.* at 1290. Given the language of express assignment, the Court noted that the provision that the employee later "execute specific assignments" did not affect the conclusion that the agreement itself automatically assigned rights, reasoning that it saw "nothing in this clause that conflicts with the clear language of the present, automatic assignment provision in the agreement." *See id.* at 1290 n.3. Thus, *DDB Technologies* "ma[kes] clear that the fact of a later execution or recordation of 'assignment' does not govern whether, based on a prior document, there was an earlier transfer of legal title." *C.R. Daniels, Inc. v. Naztec Int'l Grp., LLC*, 2012 WL 1268623, at *15 (D. Md. Apr. 13, 2012).

Multiple courts considering agreements structured similarly to the PPA have reached the same conclusion. In *Sims v. Mack Trucks, Inc.*, 407 F. Supp. 742, 744 (E.D. Pa. 1976), the court considered a contract that contained language assigning a patent directly: "Seller hereby sells to the Buyer and which the Buyer hereby purchases from the Seller . . . patent No. 2,859,949." But the contract also contained a provision requiring a later assignment: "The Seller shall execute . . . an assignment of said letters patent within one month following execution of this agreement." *Id.* The court held that the contract itself constituted a transfer of patent rights. *Id.* The purpose of the separate-assignment provision, the court explained, was to serve as a "formality designed to guarantee payment and to facilitate recordation of the assigned patent." *Id.*

*C.R. Daniels* is to the same effect. 2012 WL 1268263, at *15. In 2009, Gary Abel and Joseph Wilson designed a wheeled voting booth, for which they obtained a patent in March 2011. *Id.* at *1. On June 13, 2011, Abel and Wilson's respective employers, C.R. Daniels, Inc. and Casto & Harris, Inc., sued Naztec for selling an infringing voting booth, "Smartpoll." *Id.* at *2. Naztec moved to dismiss the suit based on electronic assignment records of the U.S. Patent and Trademark Office showing that Abel and Wilson had only assigned the rights to the patents to their respective employers three months *after* filing suit. *Id.* In response, C.R. Daniels and Casto & Harris argued that Abel and Wilson's employment agreements automatically transferred patent rights to them. In relevant part, the agreements stated, "I hereby agree that . . . any inventions or improvements that I may conceive, make, invent or suggest during my employment . . . shall become the absolute property of [my employer]." *Id.* at *4. Despite the separate assignments recorded with the PTO, the court held that the express language of the employment agreements automatically assigned patent rights from Abel and Wilson to their employers. *Id.* at *15. In short, these cases make clear that "the fact of later 'assignment' d[oes] not vitiate the earlier transfer of legal title." *Id.* at *14.

15

Finally, Cisco's suggestion that Amended Schedule B1 is operative on its own because it is "a more specific" document, Mot. at 14, is also incorrect. Amended Schedule B1 is *less* specific. The PPA, as amended, contains numerous specifics of the deal that are not included in Amended Schedule B1, and Amended Schedule B1 relies on those specifics to define, for example, the

███████████████████████████████████████████████████████████████████████████.

████████████████████████████████████████████████████████████████

████████████████████████. Thus, if the specific governs the general, the PPA is the document that assigned legal title, conditioned upon payment, *not* Amended Schedule B1.

    2.  The ███████████████ do not void the assignment of the Terrier Patents to Brazos.

Cisco next argues ██████████████████████████████████████████ render the assignment of the '106 patent void *ab initio*. Neither provision does so.

For starters, Brazos was not an ███ within the meaning of the PPA when it was assigned the Terrier Patents. The PPA specifically defines the term █████████████████ as follows:

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████

At the time of assignment, Brazos did not meet either prong of this definition. First, Brazos's ████████████████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████



Even assuming that Brazos did qualify as an ██████ neither ████████ nor ████████ were violated. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

In any event, failing to use ████████ still would not have rendered Wade's assignment to Brazos *void*. Under New York law, "[w]ith limited exception, contractual provisions prohibiting assignments are treated as personal covenants," and "[a]n assignment that violates a personal covenant prohibiting assignments gives rise to an action for damages against the assignor, ***but is enforceable***." *BSC Assocs., LLC v. Leidos, Inc.*, 91 F. Supp. 3d 319, 323–24 (N.D.N.Y. 2015). For an anti-assignment clause to deprive an assignee of its rights, the clause "must specifically use language to the effect that the assignee receives no rights from an improper assignment or that such assignment is void." *Wheelabrator Techs. of N. Am., Inc. v. Fin. Sec. Assurance of Okla., Inc.*, 1990 WL 180552, at *3 (S.D.N.Y. Nov. 15, 1990). Because ████ does not contain any such

language, Wade's assignment to Brazos was effective even if that assignment also gives rise to an action for breach of contract by Nokia.

The PPA Assignment also did not violate ██████████ .



Here, it is undisputed that Wade executed the assignment of the amended PPA to Brazos on

3.   <u>If necessary, the Court should reform the PPA to reflect the Parties' clear intent to transfer the Terrier Patents to Brazos.</u>

If necessary, reformation of the PPA and Wade Assignment is appropriate to avoid the absurd result that Cisco advances. Contract reformation is an equitable remedy that allows a court to restate the terms of a written agreement when the writing that memorializes the agreement does not reflect the parties' mutual intent. Under New York law,[6] a "party seeking reformation of a contract must show, by clear and convincing evidence, either a mutual mistake or a fraudulently induced unilateral mistake." *Roc Nation LLC v. HCC Int'l Ins. Co., PLC*, 523 F. Supp. 3d 539, 561–62 (S.D.N.Y. 2021); *see also Harris v. Uhlendorf*, 24 N.Y.2d 463, 467 (1969).

---

[6] Section 9.4 of the PPA states that New York law governs the agreement. Ex. A; *see also Schwendimann*, 959 F.3d at 1072–73 (applying Minnesota state law in reforming contract).

Here, taken together, the PPA, its subsequent amendments, and the PPA Assignment show that the parties intended to, and understood that they had, transferred the Terrier Patents to Brazos. It is undisputed that Wade and Brazos intended to assign Wade's rights in the Terrier patents to Brazos via the Assignment of Patent Purchase Agreement that assigned to Brazos ███████ ██████████████ in the PPA. Ex. C. Later amendments to the PPA between Nokia and Brazos acknowledge as much, stating that Wade ████████████████████████████ ██████████████████ Ex. D (Second Amendment); Ex. E (Third Amendment). Likewise, under the Fourth Amendment, ████████████████████████ ██████████████████ And the Fifth Amendment ████████████████████ ██████████████████████████████ None of these provisions would make sense if the parties understood and intended for Wade—rather than Brazos—to take title to the Terrier Patents.

Given the parties' mutual intent to transfer the Terrier Patents to Brazos, a defect in assignment, if any, is the result of "mutual mistake." If such a mistake exists, the Court should reform the PPA and its assignment to correct it.

### C.   The Fourth Amendment to the PPA assigned Brazos the right to seek damages for past infringement for the '014, '216, and '859 patents.

Cisco concludes its motion by half-heartedly arguing that Brazos lacks "standing"—again, purportedly in the Article III sense—to seek pre-assignment damages for the '014, '216, and '859 patents.[7] Mot. at 18–20.

As an initial matter, Cisco's argument about the scope of damages that Brazos may seek does not implicate jurisdiction. As explained, Brazos has Article III standing so long as it has

---

[7] These three patents were not part of the Terrier portfolio.  Nokia assigned them to Brazos in November 2019 after Brazos exercised its assignment option under the Fourth Amendment to the PPA.

alleged an "arguable case or controversy under the Patent Act." *Schwendimann*, 959 F.3d at 1071. And even under the Federal Circuit's abrogated exclusionary-rights rule, it is undisputed that Brazos has *at least* one exclusionary right in each patent—rights to sue for infringement for the '014, '216, and '859 patents for post-assignment damages. Cisco's argument regarding the '014, '216, and '859 patents is thus also not properly raised in a Rule 12(b)(1) motion, and Cisco's motion should be denied on this basis alone.

In any event, for the same reasons that the PPA assigned rights to the '106 patent, as opposed to Amended Schedule B1, the Fourth Amendment to the PPA assigned Brazos the rights to the '014, '216, and '859 patents—not the later executed Attachments C and E.



Accordingly, Brazos possesses the right to seek damages for pre-assignment infringement.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Cisco's Motion to Dismiss for Lack of Subject Matter Jurisdiction.

Dated: July 8, 2022

Respectfully submitted,

SUSMAN GODFREY L.L.P.

By: */s/ Shawn Blackburn*
      Max L. Tribble, Jr.
      Texas Bar No. 2021395
      Shawn Blackburn *(pro hac vice)*
      Texas Bar No. 24089989
      Bryce T. Barcelo *(pro hac vice)*
      Texas Bar No. 24092081
      1000 Louisiana Street, Suite 5100
      Houston, Texas 77002-5096
      Telephone: (713) 651-9366
      Fax: (713) 654-6666
      mtribble@susmangodfrey.com
      sblackburn@susmangodfrey.com
      bbarcelo@susmangodfrey.com

      Kalpana Srinivasan
      California Bar No. 237460
      Sujeeth Rajavolu *(pro hac vice)*
      California Bar No. 324669
      1900 Avenue of the Stars, 14th Floor
      Los Angeles, California 90067-6029
      Telephone: (310) 789-3100
      Fax: (310) 789-3150
      ksrinivasan@susmangodfrey.com
      srajavolu@susmangodfrey.com

      Danielle Nicholson
      California Bar No. 325392 *(pro hac vice)*
      1201 Third Avenue, Suite 3800
      Seattle, Washington 98101-3000
      Telephone: (206) 516-3880
      Fax: (206) 516-3883
      dnicholson@susmangodfrey.com

**COUNSEL FOR PLAINTIFF WSOU**
**INVESTMENTS, LLC D/B/A BRAZOS**
**LICENSING AND DEVELOPMENT**

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 8, 2022, I electronically filed this document with the

Clerk of Court via the Court's CM/ECF system which will send notification of such filing to all

counsel of record, all of whom have consented to electronic service in this action.

Michael E. Jones
Potter Minton, PC
110 North College, Suite 500
Tyler, Texas 75702
mikejones@potterminton.com

Brian Rosenthal                              Ryan Iwahashi
Katherine Q. Dominguez                       Gibson, Dunn & Crutcher LLP
Allen Kathir                                 1881 Page Mill Road
Allyson E. Parks                             Palo Alto, CA 94304
Gibson, Dunn & Crutcher LLP                  Phone: (650) 849-5300
200 Park Avenue                              Fax: (650) 849-5333
New York, NY 10166                           riwahashi@gibsondunn.com
brosenthal@gibsondunn.com
akathir@gibsondunn.com
kdominguez@gibsondunn.com


                                             /s/  *Shawn Blackburn*
                                             Shawn Blackburn
                                             Counsel for Plaintiff

22